IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 17–09–BU–DLC |
| Plaintiff, | |
| vs. | ORDER |
| NOLAN DAVID BARBISAN, | |
| Defendant. | |

Before the Court is Defendant Nolan David Barbisan's ("Barbisan")
motions to dismiss the Indictment in the above-captioned case.  Specifically,
Barbisan's first motion seeks to dismiss Counts I, II, and III of the Indictment and
the second motion requests dismissal of Count IV.  The Government opposes the
motions.  For the reasons discussed below, the Court will deny Barbisan's
motions.

## BACKGROUND

### A.  The Indictment

On May 18, 2017, a criminal indictment was issued charging Barbisan with
four counts of alleged violations of federal law.  Specifically, Count I alleged that
on or about October 2014, and continuing until on or about June 21, 2016,

1

Barbisan knowingly possessed approximately 46 firearms in violation of 18 U.S.C. § 922(g)(1) (Felon in Possession of Firarms).  The Indictment alleges that Barbisan's possession of these firearms was unlawful due his conviction in the State of North Dakota of a crime punishable by imprisonment for a term exceeding one year.  Similarly, Count II of the Indictment alleges that, on or about May 21, 2016, and on May 26, 2016, Barbisan knowingly made a false and fictitious written statement to a licenced firearms dealer, Gentry Custom LLC, in connection with the acquisition of a firearm.  Specifically, Barbisan is accused of falsely representing on a Department of the Treasury, Bureau of Alcohol, Tobacco, Firearms and Explosives's ("ATF") form (Firearms Transaction Record Form 4473) that he was never convicted of a felony offense.  The Indictment states that this was a false statement due a previous felony conviction in the South Central Judicial Court of Burleigh County,  North Dakota.  *See* 18 U.S.C. § 922(a)(6).  Count III is substantially similar to Count II except that it charges Barbisan with making a false statement and representation concerning his lawful status to Kelly Gentry, owner and operator of the above-mentioned Gentry Custom LLC.  *See* 18 U.S.C. § 924(a)(1)(A).

Finally, Count IV of the Indictment charges Barbisan with knowingly possessing a "silencer" that was not registered to him and had no markings or

serial numbers.  The Indictment states that Barbisan  possessed the unregistered silencer on or about June 21, 2016, in Gallatin County, Montana, in violation of 26 U.S.C. §§ 5841, 5861(d).  The Indictment lastly charges that upon conviction of any of the offenses brought against Barbisan, he is required to forfeit any real or personal property used to facilitate the offenses, including any firearms or ammunition.

### B.  Defendant's Motions to Dismiss

As discussed, Barbisan has moved through two separate motions to dismiss Counts I through IV of the Indictment.  In his first motion, Barbisan does not dispute that he was convicted in North Dakota of two felonies related to the possession and distribution of marijuana.  However, Barbisan stresses that the Government inadvertently caused him to believe that his gun ownership rights had been restored despite his felon status.  Thus, as he argues, Counts I through III of the Indictment must be dismissed because of the Government's entrapment.

Specifically, Barbisan states that upon pleading guilty to his felonies in 2012, he was sentenced to two years probation.  Because he resides in Montana, Barbisan states that the State of Montana, Department of Corrections, Adult Probation and Parole took over his supervision when he returned to his home state. Apparently, the State of Montana continued to supervise Barbisan until his

supervision was discharged on January 29, 2014.  Critically, on the date of

discharge, Barbisan maintains that the State of Montana, through his probation

officer, presented him with a "FIREARM REGULATIONS" form.  This form

contains a section entitled "TO BE COMPLETED WHEN SUPERVISION

EXPIRES," and states:

> Pursuant to §46-23-1011(3) and §46-23-1021(4), MCA, this is a
> notice and not legal advice.
>
> The Montana constitution and state law restore my civil and
> constitutional rights once I complete my sentence.  I understand that
> the operation of state law may not affect the federal prohibition
> regarding the possession of firearm and ammunition by a person
> convicted of a felony crime.
>
> The Office of the United States Attorney for the District of Montana
> has determined that federal law prohibits a person convicted of a
> felony or of a misdemeanor crime of domestic violence from
> purchasing, owning or possessing any firearm, even after completing
> his or her criminal sentence.  [Title 18, United States Code, Section
> 922(g)]

(Doc. 12-7 at 1.)

Based upon the language in this form, Barbisan maintains that he believed

that his guns rights had been restored.  However, because he was convicted under

North Dakota law, and not Montana law, this belief was erroneous.  *See* Mont.

Const. art. II, § 28(2) ("Full rights are restored by termination of state supervision

for any offense against the *state*.") (emphasis added); *see also* Mont. Code Ann. §

4

46–18–801(2) ("[I]f a person has been deprived of a civil or constitutional right by reason of conviction . . . and the person's sentence has expired . . ., the person is restored to all civil rights and full citizenship, the same as if the conviction had not occurred.").

Nevertheless, acting upon this belief, Barbisan eventually acquired firearms, completed an application for a Federal Firearms License ("FFL), and sent it to the ATF's Federal Firearms Licensing Center in March of 2016.  On this application Barbisan checked "NO" in a box which asked if he had "[b]een Convicted in any Court of a Felony, or any other crime for which the Judge Could Have Imprisoned You for More Than One Year, Even if You Received a Shorter Sentence, Including Probation?"  (Doc. 12-1 at 4.)  A footnote at the end of the question stated: "You may answer NO if (a) you have been pardoned for the crime or (b) the conviction has been expunged or set aside or (c) your civil rights have been restored AND you are not prohibited from possessing or receiving any firearms under the law where the conviction occurred."  (*Id*.)  In an attempt to clarify his answer, Barbisan states that he disclosed his felony status in a letter attached to the back of the FFL application.  This letter stated:

> This is an outline explaining why I included my rights restoration
> sheet as well.  In November of 2011 I was charged with conspiracy to
> deliver marijuana in the state of North Dakota.  I was sentenced to
> 366 days suspended with two years of supervised probation.  I have

since served and completed my sentence.  After probation I was
advised to wait to apply for my FFL or to pursue a career in law
enforcement.  I have waited and paid my dues for my mistakes,
firearms and hunting is a way of life and livelihood for myself and
family.  I hope this is everything you need and have spoken with
Investigator Lukas about my predicament and filled out my
application accordingly.  If there is anything else I need or didn't
include please let me know.  Thanks for your time.  Nolan Barbisan.

(Doc. 12-1 at 5.)  Barbisan states that he also attached a copy of the state

"FIREARM REGULATIONS" form to the application.

On April 5, 2016, the ATF reportedly returned the FFL application to

Barbisan due to multiple deficiencies with the application and allowed him 30

days to correct it.  Barbisan states that he made the changes and sent back the

application.  On May 11, 2016, the ATF sent Barbisan a letter informing him that

his criminal record indicated that he had been convicted of a felony and was

"prohibited from possessing a federal firearms license," as well as "prohibited

from processing firearms."  (Doc. 12-10.)  The letter states that unless Barbisan

submitted additional information concerning his felony status within 30 days, the

ATF would consider his application abandoned.  Barbisan never followed up on

this letter and the ATF subsequently denied his application on October 5, 2016.

However, just after the ATF sent the response letter informing him that his

application would not be approved, sometime between May 21, 2016, and May 26,

2016, Barbisan allegedly completed an ATF Firearms Transaction Record Form

4473 when purchasing a rifle from Kelly Gentry of Gentry Custom LLC in Belgrade, Montana.  (*See* Docs. 2 at 7, 12-8 at 1.)  This form must be competed whenever someone purchases a firearm from Federal Firearms License holder. *See* 27 C.F.R. § 478.124(a) (stating that a licensee "shall not sell or otherwise dispose, temporarily or permanently, of any firearm to any person, other than another licensee, unless the licensee records the transaction on a firearms transaction record, Form 4473); *see also United States v. Batterjee*, 361 F.3d 1210, 1213 (9th Cir. 2004) (describing in detail the function of Form 4473).  Apparently, Barbisan indicated on the Form 4473 that he had never been convicted of felony and allegedly told Kelly Gentry the same.  The Form 4473, and the circumstances surrounding Barbisan's completion of it, underlay the basis for Counts II and III of the Indictment.

At some point the ATF began investigating Barbisan for being a felon in possession of a firearm as well as engaging in the business of selling firearms without a FFL.  (Doc. 12-3 at 1.)   On June 21, 2016, the ATF was conducting surveillance of Barbisan when the agents witnessed him in possession of a "AR style rifle" at his home in Bozeman, Montana.  (*Id.*)  The ATF agents followed Barbisan as he left his Bozeman home and traveled to Helena, Montana.

Upon arriving in Helena, the agents contacted Lewis and Clark County

Sheriff Leo Dutton ("Sheriff Dutton") and asked him if he could conduct a traffic stop of Barbisan's vehicle.  Sheriff Dutton accommodated the agents' request and stopped Barbisan at a local Wal-Mart for expired license plate tags.  (Doc. 12-9 at 2.)  While conducting the stop, Sheriff Dutton confiscated two weapons located inside the vehicle: the AR style rifle and a handgun.  Sheriff Dutton told Barbisan that his criminal record indicated that he was a felon and prohibited from possessing the firearms.   Barbisan acknowledged his criminal history but maintained that his rights had been restored and showed Sheriff Dutton a copy of his state "FIREARM REGULATIONS" form.  Sheriff Dutton then told Barbisan that he would hold onto the firearms until his legal status could be verified. Sheriff Dutton did not tell Barbisan that he was currently being surveilled by the ATF.  Sheriff Dutton issued Barbisan two traffic citations and concluded the traffic stop.

After Sheriff Dutton and all other marked police cars had left the area, the ATF continued to surveil Barbisan at the Wal-Mart.  About an hour after the traffic stop, a maroon truck entered the parking lot and stopped next to Barbisan's truck.  A man exited the vehicle, approached Barbisan, and began engaging in conversation.  A few minutes later the man retrieved a gun case from his truck, apparently containing a "long gun," and handed it to Barbisan, who placed it into

his vehicle.  (Doc. 12-3 at 3.)  The two talked for a few more minutes, shook hands, and went their separate ways.  Barbisan eventually began making his way back to Bozeman and, upon entering the city, the ATF agents arranged for the Gallatin County Sheriff's Office to conduct a stop of Barbisan's truck.

After the vehicle was stopped by the Gallatin County Sheriff's Office and Barbisan was removed, the ATF agents approached him and identified themselves as federal officers.  They informed Barbisan that they were the process of obtaining search warrants for his truck and residence and asked for his consent to search.  Barbisan gave his consent to search his truck, but did not consent to the search of house.  After searching his vehicle, Barbisan was taken into custody.  Though not clear from the record before the Court, it appears that a search warrant was executed on Barbisan's residence and multiple firearms were seized as evidence, including the unregistered silencer which forms the basis for Count IV.

## ANALYSIS

Barbisan's first motion contends that Counts I through III must be dismissed because the Government inadvertently entrapped him into believing his gun rights had been restored.  Because he was mislead into believing that he could possess firearms, Barbisan contends that his Fifth Amendment Due Process Rights were violated and Counts I though III must be dismissed.  Similarly, Barbisan's second

motion requests dismissal of Count IV of the Indictment.  Though it charges
Barbisan with possessing a "silencer," he states that he actually possessed a
"solvent trap."  Federal laws prohibiting the possession of solvent traps, which he
argues is functionally indistinguishable from legal "low-report" ammunition, is
irrational and must be struck down as unconstitutional under rational basis review.
The Court will address these arguments in order.

### A.  Motion to Dismiss Counts I–III

As mentioned above, Barbisan contends that the "FIREARM
REGULATIONS" form given to him by his State of Montana probation officer
caused him to believe his Second Amendment right to possess a firearm had been
restored.  This form,  Barbisan argues, is an affirmative representation by the State
of Montana that he could possess firearms.  Because he relied on this written
representation, even though he was actually legally prohibited from possessing
firearms, Barbisan maintains that he is a victim of "entrapment by estoppel" by the
State and Counts I through III of the Indictment must be dismissed with prejudice.

"Entrapment by estoppel is the unintentional entrapment by an official who
mistakenly misleads a person into a violation of the law."  *Batterjee*, 361 F.3d at
1216 (quoting *United States v. Ramirez-Valencia*, 202 F.3d 1106, 1109 (9th Cir.
2000) (per curiam).  However, entrapment by estoppel is an affirmative defense

that is rightfully presented at trial, not on a pretrial motion to dismiss.  *See Batterjee*, 361 F.3d at 1216 (reviewing line of cases where entrapment by estoppel was brought as an affirmative defense); *see also United States v. Schafer*, 625 F.3d 629, 635 (9th Cir. 2010) (if a "pretrial motion raises factual questions associated with the validity of the defense, the district court cannot make those determinations").  Indeed, the cases cited by Barbisan in support of his argument, i.e.,  *United States v. Tallmadge*, 829 F.2d 767 (9th Cir. 2000) and *United States v. Batterjee*, *supra*, focused on district courts that either failed to consider this defense at trial or erroneously rejected the affirmative defense at trial.  *See Tallmadge*, 829 F.2d at 773–775 (defendant's conviction reversed for due process violations because district court failed to considered defense of entrapment by estoppel during bench trial); *see also Batterjee*, 361 F.3d at 1219 (district court erred in rejecting defendant's credible entrapment by estoppel defense during bench trial).  Thus, as is here, Barbisan's entrapment by estoppel is an affirmative defense that must be presented at trial.

Further, even if Barbisan seeks to present this defense at trial, the evidence currently before the Court is insufficient to justify allowing the defense to proceed. To order to pursue a defense of entrapment by estoppel at trial, a defendant must present a prima facie case that "(1) an authorized government official, empowered

to render the claimed erroneous advice, (2) who has been made aware of all the relevant historical facts, (3) affirmatively told him the proscribed conduct was permissible, (4) that he relied on the false information, and (5) that his reliance was reasonable." *Batterjee*, 361 F.3d at 1216 (citations and internal quotation marks omitted).

The first element of this test has been interpreted to hold that a defendant can only present this defense if the representation relied upon was made by "a federal government official empowered to render the claimed erroneous advice, or on an authorized agent of the federal government who . . . has been granted the authority from the federal government to render such advice." *United States v. Brebner*, 951 F.2d 1017, 1027 (9th Cir. 1991) (citations omitted).  Here, there is no evidence before the Court that Barbisan's state probation officer was an authorized agent of the federal government with the authority to advise Barbisan on the status of his Second Amendment rights.

Additionally, there is also no evidence that the probation officer, or any government official for that matter, affirmatively told Barbisan that he could possess firearms despite his felony convictions.  This point also distinguishes the case at bar from *Tallmadge*, 829 F.2d at 774, and *Batterjee*, 361 F.3d at 1217, where both of the defendants were affirmatively told by agents of the federal

12

government that they could own firearms.

The Court makes clear, however, that this Order is not precluding Barbisan from seeking an order from the Court allowing the defense at trial.  Rather, at this point, the Court is merely concluding that Barbisan's motion to dismiss Counts I through III of the Indictment prematurely ask the Court to rule on the merits of his defense before hearing the evidence at the scheduled bench trial.[1]  For this reason the Court will deny Barbisan's first motion to dismiss.

### B.  Motion to Dismiss Count IV

Next, as mentioned above, Count IV charges Barbisan with possession of an unregistered "silencer" in violation of 26 U.S.C. §§ 5841, 5861(d) (stating that it is unlawful "to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record"); *see also* 26 U.S.C. § 5845(7) (including silencer in the definition of "firearm").  Barbisan states that he actually possessed a "solvent trap," a device apparently used in the cleaning of firearms, which he argues he modified "for use in long-range rifle competitions as a means to abate dust clouds, caused by escaping gas from a target-rifle's muzzle."

---

[1] Barbisan also argues that the form allegedly given to him by his probation officer was an "inaccurate admonition" of the law which violated his Fifth Amendment right to due process. (Doc. 12 at 18.)  Similar to the reasoning discussed above, the Court finds that this argument is also inappropriate to resolve in a pretrial motion and is best determined at trial after hearing all the evidence.

(Doc. 14 at 2.)  The Government asserts that the solvent trap in question meets the definition of silencer under federal law and thus was required to be registered.  *See* 18 U.S.C. § 921(a)(24) (defining "firearm silencer" as "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication").

Barbisan contends that Count IV of the Indictment must be dismissed because prosecuting him for possession of a solvent trap violates his substantive due process rights.  Specifically, Barbisan raises two arguments: (1) the federal prohibition on silencers fails to satisfy rational basis review; and (2) due to the availability of legal "low-report" ammunition, a ban on solvent traps is irrational and must be struck down as unconstitutional under rational basis review.[2]

## 1.  Silencers and Rational Basis Review

At the outset, the Court notes that though Barbisan refers to the federal law underlying Court IV as a "ban," in reality federal law only prohibits non-registered silencers.  *See* 26 U.S.C. §§ 5841, 5861(d).  Nevertheless, Barbisan argues that the

---

[2] Upon a close reading of Barbisan's brief in support of the motion, it could be read to argue that the Count IV should also be dismissed because the solvent trap at issue in this case was not actually a "silencer" under federal law.  However, to the extent that this argument is being raised, the Court finds that this is a factual question best resolved at trial.

federal regulation of silencers violates his substantive due process rights.

However, it is unclear from Barbisan's briefing whether he is asserting his

substantive due process rights under the Fifth Amendment or under the Fourteenth

Amendment. Because this case involves criminal charges brought by the federal

government, the Court presumes that Barbisan is raising his substantive due

process rights under the Fifth Amendment.

Barbisan contends that federal regulation of silencers is unconstitutionally

irrational and fails to satisfy rational basis review.[3] In support of this argument,

Barbisan asserts a number of policy arguments, including: (1) the history of

silencers shows that, at the time they were regulated, they were rarely used by

criminals; (2) current statistics show that they are still used sporadically by

criminals; (3) silencers are a benefit to the public health, specifically in the

prevention of hearing loss; and (4) silencers are a legitimate tool for sporting and

hunting.

On rational basis review, the constitutionality of a statute bears "a strong

presumption of validity." *F.C.C. v. Beach Commun., Inc.*, 508 U.S. 307, 314

(1993) (citations omitted). Consequently, "[w]here a fundamental right is not

---

[3] The Court notes that Barbisan does not argue that federal regulation of silencers implicate his fundamental rights under the United States Constitution, like the right to bear arms, and, thus, strict scrutiny review should be applied. Because Barbisan does not make this argument the Court will not address it.

implicated . . . governmental action need only have a rational basis to be upheld against a substantive due process attack." *Kim v. United States*, 121 F.3d 1269, 1273 (9th Cir. 1997) (citation omitted). Thus, under rational basis review, a statute does violate substantive due process as long it "implements a rational means of achieving a legitimate governmental end." *Id.* (citation omitted).

The Government argues that the legislative history surrounding the requirement of registered silencers indicates that Congress identified silencers as a dangerous weapon that should only be available to the general public on a limited basis. Specifically, Congress sought to prevent silencers, "the tools of organized crime assassins and drug traffickers," from failing into the hands of criminals. (Doc. 16 at 8 (quoting *Armor Piercing Ammunition and the Misuse and Availability of Machineguns and Silencers*: Hearings on H.R. 641 and Related Bills Before the Subcomm. on Crime of the Comm. on the Jud. House of Rep., 98 Cong. 2.).) Thus, requiring the registration of silencers would allow the federal government to regulate who may possess a silencer and ensure that criminals cannot acquire one legally.

Based upon this argument, the Court finds that requiring the registration of silencers satisfies rational basis review. Here, the "legitimate governmental end" sought by Congress, i.e., not allowing silencers to fall into the hands of criminals,

is rationally related to the means implemented to satisfy this end, i.e., requiring the registration of silencers. Because this is all that the Government is required to show upon rational basis review, the Court declines to address Barbisan's public policy arguments.

### 2. Availability of "Low Report" Ammunition

Next, Barbisan argues that the regulation of silencers is irrational and unconstitutional given that there are legal substitutes to the devices in the form of "low report" ammunition. Barbisan states that "low report" ammunition is a type of commercially available ammunition that, when fired, produces little noise. This type of ammunition, Barbisan suggests, is the functional equivalent to silencers and it is unconstitutionally arbitrary for the federal government to require the registration of silencers and not low report ammunition. The Court disagrees.

First, the Court points out that silencers and low report ammunition are not the functional equivalent to one another. As discussed in detail in the Government's brief in opposition to Barbisan's second motion, ammunition and silencers are two different things. Ammunition is a projectile fired from a firearm. This is not the equivalent to a silencer, which is a device attached to a firearm which silences, muffles, or diminishes "the report of a portable firearm." 18 U.S.C. § 921(a)(24). These items are not one in the same and are functionally

17

different.  The Court finds Barbisan's comparison to be unavailing.

Further, the Court is also ultimately persuaded by the fact that low report ammunition, or bullets that contain less propellant powder than traditional 'louder' bullets, are less powerful than louder bullets.  For example, Barbisan submitted tests that arguably showed that "low report" .22 caliber ammunition registered at a comparable decibel level to more louder .22 caliber ammunition that was fired through his "solvent trap."  However, as noted by the Government, this low report ammunition traveled at a lower velocity and with less energy than louder bullets, and thus, had less stopping power.  The Court finds that this distinction is fatal to Barbisan's argument that low report ammunition and solvent traps are the functional equivalent.  Consequently, the Court will deny Barbisan's second motion to dismiss.

Accordingly, IT IS ORDERED that:

(1) Defendant's Motion to Dismiss Counts I–III of the Indictment (Doc. 11) is DENIED; and

(2) Defendant's Motion to Dismiss Count IV of the Indictment (Doc. 13) is DENIED.

Dated this 27th day of July, 2017.

Dana L. Christensen, Chief District Judge
United States District Court